Filed 6/3/26  P. v. Maraglino CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DOROTHY GRACEMARIE MARAGLINO, <br><br> Defendant and Appellant. | D084191 <br><br><br> (Super. Ct. No. SCN304686) |

APPEAL from an order of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Stephanie H. Chow and Anne Spitzberg, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Dorothy Gracemarie Maraglino was sentenced to prison in 2015 after a jury found her guilty of kidnapping, conspiracy to commit kidnapping, and first-degree felony murder with a kidnapping special circumstance. She appeals the trial court's order denying her petition to vacate the murder conviction and to resentence her on the other convictions under former section 1170.95 of the Penal Code,[1] now section 1172.6. The trial court based its denial on the determination the evidence proved beyond a reasonable doubt that Maraglino was a major participant in the kidnapping of the victim and acted with reckless indifference to human life. She argues the evidence presented at the evidentiary hearing was insufficient to support that determination. We conclude otherwise and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Convictions and Trial Evidence*

Following the death of Brittany Killgore, in 2015 a jury convicted Maraglino, as well as her codefendants Louis Ray Perez and Jessica Lynn Lopez, of first degree murder (§ 187, subd. (a); count 1); kidnapping (§ 207, subd. (a); count 3); torture (§ 206; count 4); and attempted sexual battery by restraint (§§ 243.4, subd. (a) & 664; count 5). As to all three defendants, the jury found true the special circumstance that the murder was committed during a kidnapping (§ 190.2, subd. (a)(17)(B)). The jury also convicted Perez and Maraglino of conspiracy to commit kidnapping (§§ 182, subd. (a)(1) & 207; count 2), but it acquitted Lopez of this charge. The trial court

---

[1]     Further unspecified statutory references are to the Penal Code.

sentenced Maraglino to prison for life without the possibility of parole for the murder conviction and to determinate terms for the other convictions.

Maraglino (as well as Perez and Lopez) appealed, challenging the sufficiency of the evidence supporting each of her convictions and raising other claims of error. On December 29, 2017, we issued our opinion reversing her convictions on count 4 (torture) and count 5 (attempted sexual battery by restraint) for insufficient evidence and otherwise affirming the judgment against her. (*People v. Maraglino* (Dec. 29, 2017, D069297, D069609) [nonpub. opn.].) The following summary of the trial evidence underlying Maraglino's convictions is taken from that opinion.[2]

"On April 13, 2012, Perez picked up Killgore from her apartment under the pretext of taking her on a dinner cruise. Ten minutes later, Killgore sent her friend a text message saying, 'Help.' Four days later, detectives recovered her nude body near Lake Skinner in Riverside County. Evidence presented at trial suggested Killgore died while defendants were acting out a BDSM [bondage, dominance, and sadomasochism] kidnapping fantasy.

"Perez, Maraglino, and Lopez were active participants in the BDSM lifestyle, respectively occupying roles in their household of 'master,' 'mistress,' and 'slave.' Perez and Maraglino were in a dominant-submissive relationship wherein Perez was the dominant and Maraglino was his submissive. Perez lived in a separate residence but often visited Maraglino at her home in Fallbrook, California. Lopez was Maraglino's slave and lived in Maraglino's home.

---

[2] We grant Maraglino's unopposed request for judicial notice of the record in appeal No. D069297, including the opinion. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 426, fn. 1.)

3

"As a masochist, Lopez enjoyed receiving pain; Maraglino would inflict pain on her through BDSM 'play.' Although a slave in the Maraglino household, Lopez had been a dominant in the past and in an ongoing online relationship with someone named Bella. Maraglino was a 'switch,' meaning she was submissive with Perez and dominant with Lopez. Maraglino established written procedures, including a 'House Manual,' 'Perfect Slave Checklist,' and slave contract. She controlled everything Lopez did inside and outside the home; Lopez wore a dog collar stating she was Maraglino's property. As Maraglino's master, Perez had control over Maraglino's household, including control over Lopez.

"Perez was a sadist and enjoyed inflicting pain on others. . . . Although there was testimony Perez was considered a 'safe' player in the BDSM community who acted only with consent, detectives found a video of Perez beating a woman with various implements as she begged him to stop and continuing to beat her past the point of consciousness.

"All three defendants had BDSM abduction, torture, and murder fantasies. Lopez's diary contained a ciphered writing in which she abducted, tortured, and killed someone she disliked, disposing of the body and dousing evidence with bleach. Maraglino authored a writing about abducting three generations of women, each one 'prescribed a method of death' and subjected to sexual torture, torture, and forced suicide. Maraglino authored a separate writing, found in Perez's garage, in which she slit the throat of a woman while that woman was having sex with Perez. Maraglino made a handwritten list of 'hunting ground[s]' for vulnerable victims that included ways to dispose of a body and avoid detection. Perez and Maraglino discussed their abduction fantasies with Dora B., another of Maraglino's slaves, on two or three occasions. At one point, Maraglino asked Dora how

4

she would react if a kidnapped woman were brought to the home. Dora worried these fantasies 'didn't always take consent into account,' but she 'wanted to believe that it was nothing more than a fantasy.'

"Perez and Maraglino acted out an abduction fantasy on Nicole A. Without prior agreement, Perez and Maraglino picked up Nicole in a parking lot, blindfolded her, undressed her in the 'dungeon' in the basement of Maraglino's home, restrained her, and engaged in BDSM play. Thereafter, Nicole voluntarily joined the household for a short period as Maraglino's slave.

"Perez and Maraglino had an open relationship, but Maraglino was paranoid about losing him to another woman. Nicole's relationship with Maraglino soured because Nicole communicated with Perez directly, rather than go through her. As their relationship deteriorated, Maraglino made threatening statements toward Nicole's daughter. When Perez began seeing Marina V., Maraglino talked about killing Marina and wanting her to die a torturous death; in an online forum, she threatened to kill Marina and Marina's daughter. Perez and Maraglino briefly broke up over Marina; they soon rekindled their relationship and in 2011 conceived a child.

"Although there was some evidence the relationship between Perez and Maraglino became more conventional after they reunited, there was also evidence they remained involved in BDSM. Lopez remained Maraglino's slave. Maraglino kept her BDSM toys and, on the day of Killgore's disappearance on April 13, 2012, sent Deborah E. a text message about a forced lactation-torture fantasy. . . . On the day before Killgore's disappearance, Perez texted Alda E. about upcoming plans to engage in BDSM play with someone he did not like, which to Alda was a 'very big red

5

flag.' Alda told Perez not to go through with it, but he said it would give him 'control to temper my feelings and not hurt[ ] someone I want to hurt badly.'

"Killgore's close friend, Elizabeth Hernandez, became friends with Maraglino in 2011. Hernandez would often visit Maraglino's home and bring Killgore with her. Killgore and Hernandez were not involved in BDSM, but both knew that defendants were. Although Maraglino was initially friendly with Killgore, she became hostile toward her after she perceived Killgore flirting with Perez. Maraglino called Killgore 'the disease' and 'the herpes' when she was not around; asked why Hernandez and Killgore were always together; and seemingly in jest, offered to get rid of Killgore for Hernandez. . . . On April 13, 2012, the day of Killgore's disappearance, Maraglino wrote a letter stating:

> 'I Dee [Maraglino] do hereby give to Ivan [Perez] all my grudges and revenge from my birth till now. I release my anger and entrust justice into Ivan's hands. I accept Ivan will decide, design, and dispense the measure of retribution he deems appropriate to my enemies, tormenters, and violators.'

"Lopez appeared to have a better relationship with Killgore, but she, like Maraglino, called Killgore 'the disease' and 'herpes' and joked, on April 13, 2012, that she would make Killgore walk the plank at her pool party the next day.

"On the afternoon of April 13, 2012, Hernandez visited Maraglino's home to return a camera charger. She stayed to socialize with Maraglino and Perez; Lopez was not home. Maraglino seemed excited to hear Killgore was going to move to the east coast, saying Hernandez would finally be 'free.' Hernandez told Perez and Maraglino about her recent excursion on the Hornblower dinner cruise in San Diego. She said Killgore seemed very interested in going, and she wanted to take Killgore on a cruise before she moved. Hernandez recalled nothing out of the ordinary about her

conversation. Perez and Maraglino did not mention having tickets or plans to go on a dinner cruise that evening.

"Killgore and Hernandez lived in the same apartment complex on Ammunition Road in Fallbrook, as did friends Channy Tal . . . and Jessica Perry. At 4:38 p.m.[3] on April 13, 2012, Perez knocked on Killgore's door. Tal was in the apartment, helping Killgore pack for her upcoming move. Killgore asked Perez how he knew where she lived; Perez replied that he had 'asked around.' Perez pressed Killgore to come with him on the Hornblower dinner cruise that night, saying he had two tickets but nobody to go with. Killgore declined. Perez gave Killgore his phone number, and security footage showed him leaving the complex at 4:54. When leaving the apartment, Perez texted Maraglino, 'That guy wasn't successful,' to which Maraglino replied, 'Tomorrow is another day.'

"A few minutes after Perez left, Killgore texted to ask if he knew anyone who could help move her belongings. At 5:00, Perez texted Killgore, 'Party with me tonight & you'll have five guys there in the morning.' Killgore replied that she would welcome help moving but felt 'weird about the partying' because she did not think Maraglino would like it.

"Killgore told Tal she was uncomfortable accompanying Perez because he was in a relationship with Maraglino. Perez responded to Killgore's text, saying Maraglino was 'ok with it' and suggesting at 5:19 that Killgore text her to confirm. Killgore replied at 5:26 that she did not know Maraglino's number and did not think Maraglino liked her. Perez reassured Killgore that was not the case and gave her Maraglino's number. At 5:39, Perez checked in to see if Killgore had contacted Maraglino. Killgore replied two minutes later

---

3    "All times are p.m. unless otherwise noted."

7

that she had not but would. At 5:42, Maraglino searched the Internet on her phone for 'San Diego dinner cruise.' A minute later, Perez texted Killgore to say he was 'dressing up to go to dinner on the [H]ornblower.'

"Killgore called Maraglino and left a voicemail message at 5:55. Maraglino called back ten minutes later, and Tal overheard their conversation. Maraglino seemed friendly and was laughing; she told Killgore to go with Perez on the cruise because she was pregnant and would get seasick. After speaking with Maraglino, Killgore decided to go. She told Tal she had no interest in Perez, but thought it would be her last chance to go on the dinner cruise before she moved to Pennsylvania the following week.

"Killgore texted Perez around 6:10 agreeing to go, asking what time he would pick her up and when his friends would help her move. At 6:12, Maraglino searched the Internet on her cell phone for 'Hornblower San Diego.' Perez sent Killgore texts at 6:15 and 6:19 asking her to be ready at 7:30 that night and stating his friends would help her move in the morning. At trial, the parties stipulated that on April 13, 2012, the Hornblower cruise left the dock in San Diego at 7:00, meaning it would not have been possible to make it if they left Fallbrook at 7:30, and that Maraglino, Perez, and Killgore did not have tickets for the cruise.

". . . At 6:38, Killgore texted Hernandez that Perez had stopped by to ask her out and it was 'odd.' Hernandez followed up, and Killgore texted her at 7:30 that Perez was taking her '[t]o the [H]ornblower and a casino' after Maraglino had given permission. Hernandez testified that this plan confused her because Perez and Killgore hardly interacted.

"At 7:31, Perez sent Killgore a text message saying, 'I'm running late be there in five minutes, can you meet me at the curb? I got stopped at the front gate.' . . . Killgore responded, 'At the curb? It's raining you know. I[']d

8

appreciate it if you drove into the complex.'  Perez responded, 'It's not.  I don't want to miss our boat.'  Perez called Killgore and evidently agreed to drive up to her complex.  Surveillance footage showed Perez entering the complex at 7:36.  At 7:37, Perez texted Killgore, 'I'm here,' and Killgore responded, 'I'm out now.'  At 7:39, Killgore texted Perry that she was going with Perez on a dinner cruise and might stop by to visit Perry afterwards.  Surveillance footage showed someone getting into the passenger side of Perez's car; the car pulled out of the lot around 7:40.  Perez testified that he then drove Killgore to Maraglino's home to pick up a flier, and a neighbor recalled Perez's car swerving up to Maraglino's residence near dusk.

"At 7:50, ten minutes after leaving her apartment complex with Perez, Killgore sent Tal a text message that read, 'Help.'  Killgore's cell phone was closer to Maraglino's house than to her apartment when she sent that text.  At 7:57, Perez texted Maraglino, 'Kitten?'  At that point, Maraglino and Lopez were shopping at a grocery store located just minutes away from Killgore's apartment and about 5 to 15 minutes from Maraglino's home (depending on traffic).  Around 7:58, Lopez left the store to retrieve her wallet from Maraglino's home while Maraglino waited at the checkout aisle.

"Around 8:00, Tal tried three times to contact Killgore.  At 8:05, she received a text from Killgore's phone stating, 'Yes I love this party.'  Tal was suspicious because the message did not resemble Killgore's texts.  She demanded Killgore call her so she could hear her voice.  Tal received another suspicious text message from Killgore's phone at 8:07 that said, 'In a few hot guys.'  Tal insisted Killgore call her immediately, and Killgore's phone made two short calls to Tal at 8:09 and 8:10.  Tal texted Killgore that she could not hear her when she called, and Killgore's phone sent Tal a message stating,

9

'It[']s ok music is too loud.' At trial, Perez admitted using Killgore's phone to call her friends while playing loud background music from his car.

"Meanwhile, Maraglino, who remained at the grocery checkout aisle, left missed calls on Lopez's phone at 8:07 and 8:09. At 8:10, Maraglino stepped outside and returned a few seconds later with Lopez. At 8:11, Perez texted Maraglino, 'Come home,' suggesting he was then at Maraglino's home. At 8:12, Lopez and Maraglino were seen on video leaving the grocery store.

"Killgore's friends grew very concerned. At 8:14, Hernandez called Killgore; cell location data placed Killgore's phone near Maraglino's house at that time. At 8:21, Hernandez called Maraglino, who lied that she had not spoken to Killgore that day. At 8:30, Tal texted Killgore, demanding she call her. At 8:40, Perry called Perez, who told her he had left Killgore downtown at a club. Perez told Perry he had last seen Killgore talking to some guys outside the club. He kept repeating that Killgore's face looked okay, which struck Perry as odd. Cell location data indicated Perez and Lopez were both in the vicinity of Maraglino's home in Fallbrook up to this point.

"Maraglino, who previously worked for a cell phone company, told Perez that cell phones were traceable. Perez then decided to dispose of Killgore's phone in downtown San Diego to corroborate the story he had told Perry. At 9:20, cell location data showed Perez driving southbound from Fallbrook toward San Diego. Perez had Killgore's phone with him. While driving south on the I-15, Perez texted Killgore 'Where are you?' and 'You[r] friends are calling me worried.' He texted Maraglino asking about her night, and Maraglino replied that she was having a quiet night at home. Perez later admitted to using Killgore's phone to send text messages to her friends. At 10:10, Tal tried again to call Killgore and texted, 'Should I just call the cops.' Killgore's phone responded from a downtown San Diego location, 'I[']m

10

ok.' Perez's license plate was photographed downtown by a San Diego Police Department license reader at 10:34. Perez's phone and Killgore's phone remained downtown until 10:51, when Perry tried again to reach Killgore.

"At 11:02, Perez called Perry as he was driving north from San Diego toward Fallbrook. Perez sounded frantic and told Perry he had been driving around looking for Killgore. Perez returned to Maraglino's home after midnight. Thereafter, cell data showed Perez's and Lopez's cell phones moving east toward Temecula. In the early hours of April 14, both Perez's and Lopez's cell phones were traced near Lake Skinner and later [were] traced returning toward Maraglino's home. At trial, Perez [testified it was Lopez who killed Killgore. He] explained that he and Lopez wrapped Killgore's corpse in a tarp and put it in a trailer that they hitched to Perez's car. Perez drove the trailer to Lake Skinner, with Lopez tailing his car to cover the trailer's missing license plate, and the two dumped the body near Lake Skinner.

"On the morning of April 14, Hernandez confronted Maraglino, saying she knew Maraglino had spoken to Killgore the previous day. Maraglino stuttered and gave the phone to Perez. During the call, Perez changed his story two or three times as to what had happened the previous night.

"Tal and Hernandez . . . called the sheriff's department. Perez called Hernandez around noon and offered to drive her around to look for Killgore; Hernandez told him law enforcement had already arrived. Sheriff's Deputy James Breneman called Perez, who sounded panicked but offered to come talk in person.

"Perez drove to Killgore's apartment complex on the afternoon of April 14. . . . [He] told detectives Killgore was flirty, flighty, and that she had been drinking; Killgore's friends did not agree with these characterizations.

11

Perez claimed he had left Killgore downtown at a club the night before and that Killgore had texted him, 'I'm okay.'  Deputy Breneman was suspicious when he did not find that text on Perez's phone.  He also found it strange that Perez's car was caked with fresh mud, given the heavy rains the night before.  Perez agreed to provide a voluntary statement at the sheriff's department and was transported there.  He consented to a search of his vehicle and was placed under arrest when deputies found an unlawful weapon inside. . . .

"Deputies searched Maraglino's home on April 15 and 16.  On April 16, Lopez and Maraglino were gone, and some items seen the previous day were missing, as if someone had cleaned up.  The sheriff's department authorized a search for Maraglino's truck, which bore the license plate, 'Ivnsktn' ('Ivan's Kitten,' indicating Maraglino was Perez's 'Kitten').  Deputies found the truck on April 17 at a hotel parking lot near the San Diego airport.  They forcibly opened a room booked under Maraglino's name and found Lopez, bleeding at the neck and half naked after an apparent suicide attempt.  In the room were three copies of a seven-page handwritten confession letter by Lopez, with a sign above stating, 'Pigs read this.'

"In the letter, Lopez used derogatory language, describing Killgore as a 'miserable cunt' who had tried to come between Perez and Maraglino.  Lopez took complete responsibility for Killgore's death, saying sheriffs had arrested the 'WRONG FUCKING PERSON' in Perez.  Lopez claimed she alone had grabbed Killgore; slammed her body into the stairs; restrained her wrists, ankles, and mouth; subdued her with a Taser; wrapped rope around her neck to apply and release pressure; attempted to hack up the body with power tools; doused the body with bleach; and dumped the body near Lake Skinner. The letter described injuries that would likely be found on Killgore's body—

ligature marks around her neck and wrists, a Taser mark near her neck, and bruising and mutilation marks.[4]  Lopez expressed her love to Maraglino as her slave and pet; sheriffs found a dog collar in the room marking Lopez (alias Rosalin) as 'Property of Ms. Dee [Maraglino].'  There were three copies of the confession letter in the hotel room, one addressed to 'Master Ivan' (Perez), another to 'My parents,' and a third to a local media station.  Surveillance video showed the hotel receptionist making copies of the letter for Lopez the previous night.  Maraglino was in the hotel when Lopez had her letter copied and departed San Diego on the morning of April 17 to visit family in Virginia.  Deputies accompanied Lopez to the hospital, and she was arrested thereafter.

"Based on Lopez's letter, deputies focused their search team on the Lake Skinner area in Riverside County.  Later that afternoon on April 17, deputies found Killgore's nude body about a mile from Lake Skinner.  The medical examiner determined the cause of death to be ligature strangulation, with hemorrhaging in her eyes consistent with pressure being intermittently applied and released over a long period.  The cricoid cartilage of Killgore's neck had been fractured, indicating someone had applied more than 33 pounds of pressure on her neck.  There were bruises on her legs, a bruise outside her left wrist consistent with the use of handcuffs, two cuts forming a 'T' on her left wrist, and five small pinprick marks on the left side of her face, consistent with the use of a stun baton.  In addition, there was a deep postmortem cut to Killgore's left knee with marks consistent with the use of a

---

4    "The letter also contained statements that did not correspond with other evidence, including that the murder happened after 11:15 and that Killgore, who did not drive, appeared suddenly at the residence to demand sex with Perez."

power saw.  The lack of maggots was consistent with the wound having been doused with bleach.  There were postmortem abrasions on Killgore's back, consistent with the body being rolled down the embankment.  There were no internal or external injuries to Killgore's genitalia.

"As lead sheriff's detective Brian Patterson was driving to Lake Skinner on April 17, Maraglino called him to say that she and Lopez ordered a movie on cable on April 13 called 'Adventures of Rin Tin' and had spent the night in.  Her cable records later indicated she rented 'Tintin' on April 14 and did not rent any movies on the 13th.  Maraglino hung up after Patterson pressed her on inconsistencies with Perez's account, insisting that he could not get her to contradict Perez.

"Officers searched Maraglino's home again on April 19.  They recovered the roll of plastic mentioned in Lopez's letter and photographed a reciprocating saw blade in a drawer near the hallway.  They also recovered various images, videos, documents, and BDSM implements from the home. . . .  Officers recovered a release of liability form in which Maraglino stated she voluntarily engages with Perez in BDSM activities, including whipping, beating, and asphyxia, and that she relieved Perez of 'injuries or loss of life that my result.'  They also recovered the April 13 writing in which Maraglino released her anger to Perez and entrusted him to deliver justice and retribution.  Maraglino was arrested in May 2012.

"A later search of Perez's vehicle revealed a plastic bag containing food wrappers, disposable gloves, a piece of plastic, and a stun baton in working condition.  There was blood on the plastic gloves, pieces of plastic, and the plastic bag matching Killgore's DNA.  Swabs from the piece of plastic and the gloves matched Perez's DNA.  The stun baton contained Perez's DNA on the straps and handle and Killgore's DNA on the prongs.  There was no semen

14

found in Perez's car. Tire treads from Perez's car were a possible match to the treads found near Killgore's body at Lake Skinner.

"Sheriff's deputies ultimately found no evidence of blood or semen at Maraglino's home. They recovered a rope and knife from Maraglino's truck but could not connect those items to Killgore's murder. They also recovered from Maraglino's truck a receipt for cleaning products, water, paper towels, and rubber gloves purchased on April 14.

"A special agent with the Naval Criminal Investigative Service searched Perez's home on base and found additional BDSM writings, including Maraglino's throat-slit fantasy writing. Maraglino's cell phone was found a year and a half later, cleared of text data, disassembled, and underneath several suitcases in a closet in her brother's house in Missouri. The clothes worn by Maraglino, Perez, and Killgore on April 13 were never recovered.

"At trial, Perez admitted he had lied to Perry and detectives about taking Killgore downtown, and he admitted taking Killgore's cell phone downtown to match that story. He claimed he had lied to protect Maraglino but denied doing so to give her more time to clean up. Perez admitted he had misled Killgore into believing they were going on a cruise long after they had already missed it in order to get her into his car. He also admitted telling Becky Z. on October 17, 2013, 'everybody had a role to play that night, including myself.' On redirect, Perez explained this statement referred only to his role in the cover-up and that he had also told Becky, 'I didn't kill anybody.' "

## II.

### *Change in the Law Governing Felony Murder*

In 2018, our Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which "significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*).) As amended, the law "limits liability under a felony-murder theory principally to 'actual killer[s]' ([§] 189, subd. (e)(1)) and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2))." (*Strong*, at p. 708.) "Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life.'"[5] (*Strong*, at p. 708.)

---

[5]     Our Supreme Court has identified nonexclusive factors to be considered in determining whether a defendant was a major participant in a felony who acted with reckless indifference to human life. Factors used to determine whether a defendant was a major participant in the felony that resulted in death include the defendant's: (1) role in planning the criminal enterprise that led to one or more deaths; (2) role in supplying or using lethal weapons; (3) awareness of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of other participants; (4) presence at the scene of the killing, ability to facilitate or prevent the killing, and actions or inactions that played a particular role in the death; and (5) conduct after lethal force was used. (*People v. Banks* (2015) 61 Cal.4th 788, 803 (*Banks*).) Factors used to determine whether the defendant acted with reckless indifference to human life include: (1) use or awareness of the presence of a weapon or weapons; (2) physical presence at the scene and opportunity to restrain confederates or aid the victim; (3) duration of the crime; (4) knowledge of confederates' likelihood of killing

16

Senate Bill 1437 also created a procedure for those convicted under the former law to seek relief under the law as amended. (*Strong, supra,* 13 Cal.5th at p. 708; former § 1170.95, now § 1172.6.) Defendants seeking such relief may initiate the procedure by filing a petition declaring "that '[t]he petitioner could not presently be convicted of murder . . . because of [the] changes to . . . [s]ection 188 or 189.' " (*Strong,* at p. 708.) If the trial court determines the petition states a prima facie case for relief, it issues an order to show cause and holds an evidentiary hearing at which the prosecution bears the burden of proving beyond a reasonable doubt that the petitioner is guilty of murder under the law as amended by Senate Bill 1437. (§ 1172.6, subds. (c), (d)(3); *Strong,* at pp. 708, 709.) If the prosecution fails to sustain its burden of proof, the court must vacate the murder conviction and any attached allegations and enhancements and resentence the petitioner on any remaining charges. (§ 1172.6, subd. (d)(3).)

III.

*Proceedings on Petition for Resentencing*

In December 2018, Maraglino petitioned for resentencing under former section 1170.95, now section 1172.6. She alleged she "was not a major participant who acted with reckless indifference to human life." After appointing counsel and receiving briefing, the trial court held a hearing at which it denied the petition for failure to state a prima facie case. On

---

or propensity for violence; and (5) efforts to minimize the risks of violence. (*People v. Clark* (2016) 63 Cal.4th 522, 618–623 (*Clark*).) "The major participant and reckless indifference elements often significantly overlap." (*Strong, supra,* 13 Cal.5th at p. 706 [cleaned up].) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks,* at p. 803; accord, *Clark,* at p. 618.) "All may be weighed in determining the ultimate question" of the defendant's liability for felony murder. (*Banks,* at p. 803.)

Maraglino's appeal, we reversed the denial order and remanded the matter with directions to the trial court to issue an order to show cause and hold an evidentiary hearing.[6] (*People v. Maraglino* (Nov. 4, 2022, D077746) [nonpub. opn.].)

A.    *Evidentiary Hearing*

On remand the trial court issued an order to show cause, set a briefing schedule, and calendared an evidentiary hearing. At the hearing, the court stated it had read Maraglino's petition, the People's "opposition," and the entire transcript of the trial.[7] Maraglino was the only witness to testify at the hearing.

Maraglino admitted she wrote the April 13, 2012 letter releasing her " 'anger' " to Perez and entrusting him with the task of " 'dispens[ing] the measure of retribution he deems appropriate to [her] enemies, tormentors, and violators.' " Maraglino claimed she wrote the letter as "recommended therapy" for the "anger" and desire for "vengeance" she felt against a relative who had molested members of her family and whom she expected to encounter at an upcoming family reunion. She denied the letter had anything to do with Killgore. Maraglino also denied she harbored animosity or jealousy toward Killgore or had referred to her by derogatory names.

Maraglino admitted telling Killgore over the telephone on April 13, 2012, that she had no objection to her going on a dinner cruise with Perez. Maraglino admitted she searched the Internet for information about dinner

_____

[6]    We grant Maraglino's unopposed request for judicial notice of the record in appeal No. D077746, including the opinion. (See fn. 2, *ante*.)

[7]    Maraglino's petition and the trial transcripts are included in the record, but the People's "opposition" is not. A minute entry indicates the People filed a return to the order to show cause, but the return is not included in the record.

18

cruises in San Diego and shared the schedules she found with Perez. She admitted neither she nor Perez had tickets to go on a dinner cruise that day.

Maraglino testified her BDSM writings were only fantasies and were not intended to be acted upon. She claimed the writings related to her aspiration to become a published author and formation of an organization that focused on safety issues in the BDSM community.

Maraglino admitted she wrote the document purporting to release Perez from any civil or criminal or liability for "any injuries or loss of life that may result from [their BDSM] activities." She said that more than once she had lost consciousness during their "play sessions," which included being held under water, being strangled, being suspended and whipped, and being cut with knives. Maraglino acknowledged her "level of play" with Perez involved the risk of death.

Maraglino testified she was no longer an active physical participant in BDSM in April 2012 but maintained relationships with individuals who were. She continued to exchange text messages of a sexual nature with a member of the BDSM community and kept "some floggers and BDSM tools" in her home.

Maraglino admitted she was in the hotel room with Lopez when Lopez wrote the letter confessing to Killgore's murder. Maraglino said it was her "fault that [Lopez] wrote the letter" but denied telling Lopez what to write or knowing the content.

Maraglino made several admissions that she had been untruthful: (1) after Perez was arrested, she falsely told several people she did not know he was taking Killgore out on April 13, 2012; (2) she did "some things to get rid of evidence in this case"; and (3) she "lie[d] to investigators" to protect Perez.

19

After Maraglino finished testifying, counsel made closing arguments. Her counsel argued there was no evidence she participated in Killgore's death, provided weapons, could have prevented the death, or knew and should have warned Killgore she was in danger by going out with Perez. The People argued Maraglino's convictions of kidnapping and conspiracy to commit kidnapping showed she was a major participant in the felony during which Killgore was killed. They argued the *Clark* factors (see fn. 5, *ante*) showed Maraglino acted with reckless indifference to human life: (1) she knew weapons used in the killing were in her home, where the killing occurred; (2) she was present when Killgore was tortured and killed but did nothing to prevent it; (3) the kidnapping was not of short duration; (4) she knew from her own experience the violent nature of BDSM activities in which Perez and Lopez engaged and the risk of death they posed; and (5) she enhanced the risk of violence by conspiring to kidnap Killgore. The People contended Maraglino was not a truthful witness and urged the trial court not to credit her testimony.

B. *Trial Court Ruling*

The trial court did not find Maraglino credible, based on her demeanor, inconsistent recollection, lapses in recollection, and admissions of lying during the case. The court stated the People had the burden to prove beyond a reasonable doubt that she was ineligible for relief under section 1172.6 because she was a major participant in Killgore's kidnapping and acted with reckless indifference to human life. The court addressed the *Banks* and *Clark* factors and made detailed findings on each one.

Starting with the *Banks* (major participant) factors, the trial court found Maraglino was "the ringleader" and "the central figure" in this case. The court reasoned that Killgore's flirting with Perez gave Maraglino a

motive to harm Killgore; Maraglino had BDSM fantasies about kidnapping, raping, and torturing an unwilling victim; she had charge of the house where Killgore was taken, tortured, and killed; and the jury found Maraglino guilty of kidnapping and conspiracy to commit kidnapping. The court noted Maraglino's role in the planning of the criminal enterprise included searching the Internet for dinner cruises in San Diego, encouraging Killgore to go out with Perez, and returning home after Perez told her to do so. On the provision or use of weapons factor, the trial court found Killgore was taken to Maraglino's house, where BDSM implements, rope, and power tools were present and used to inflict the wounds found on Killgore's body. On the awareness of dangers factor, the court found this case was not only about the dangers inherent in the BDSM lifestyle and the use of weapons but also about Maraglino's dislike of Killgore and the plan to kidnap her "for exactly what happened in this particular case." As for presence at the scene and ability to prevent or facilitate the murder, the court found Maraglino was at home and facilitated the murder by luring Killgore there and controlling the acts of Lopez. The court found that after the murder, Maraglino destroyed evidence, fled the state, and hid her cell phone in another state.

Turning to the *Clark* (reckless indifference) factors, the trial court found Maraglino knew about weapons because "everything was self-contained within her house where [Killgore] was brought, including all the weapons that were used pre- and postmortem." The court found Maraglino was physically present at the scene of the crime, which she set up and did nothing to stop. As to the duration of the felony, the court noted Perez picked up Killgore at about 7:37 p.m. on April 13, 2012, Maraglino left the grocery store at 8:12 p.m. to return home when Perez told her to do so, and Killgore's body was dumped in Riverside County around 4:00 a.m. the next day. "And at

21

some point during that long time frame, [Killgore] was restrained, tased, tortured, strangled, and killed." As for knowledge of cohorts' likelihood of killing, the court found that Maraglino had "significant knowledge of violent sexual conduct" from involvement in the BDSM community and that "the mistress/slave dynamic [was] highly relevant." Finally, the court found Maraglino "never t[ook] any efforts to minimize the risks of what was going on," and "everything that was going on was because of her."

Based on its assessment of the *Banks* and *Clark* factors, the trial court ruled Maraglino was ineligible for resentencing under section 1172.6 because the People had proved beyond a reasonable doubt that she remained culpable of felony murder under current law as a major participant who acted with reckless indifference to human life in Killgore's kidnapping. The court denied the petition.

## DISCUSSION

Maraglino challenges the trial court's denial of her petition for resentencing under section 1172.6. She contends the record contains insufficient evidence to support the court's findings that she was a major participant who acted with reckless indifference to human life in the kidnapping during which Killgore was killed. Maraglino also contends the court's ruling is so arbitrary and capricious that it violates her federal constitutional right to due process of law. She asks us to reverse the order denying her resentencing petition. We decline.

### I.

### *Relevant Legal Principles*

We review the denial of a section 1172.6 petition after an evidentiary hearing for substantial evidence. (*People v. Emanuel* (2025) 17 Cal.5th 867, 885 (*Emanuel*).) "Under this standard, we review the record in the light most

favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find beyond a reasonable doubt that [Maraglino was a major participant who] acted with reckless indifference." (*Ibid.* [cleaned up].)

We "presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. Conflicts and even testimony that is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. A reversal for insufficient evidence is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the jury's verdict." (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 [cleaned up].) And " 'unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281.)

" 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) " '[C]ircumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "We must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence. . . . Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary

finding does not warrant the judgment's reversal." (*Clark, supra*, 63 Cal.4th at p. 889 [cleaned up].)

One foundational principle of appellate review is that "the [order] challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 (*Sanghera*).) When an appellant "claims on appeal that [her] conviction was based on insufficient evidence of one or more of the elements of the crime of which [s]he was convicted, we *must* begin with the presumption that the evidence of those elements *was* sufficient, and the [appellant] bears the burden of convincing us otherwise. To meet that burden, it is not enough for the [appellant] to simply contend, 'without a statement or analysis of the evidence, . . . that the evidence is insufficient to support the [order].' " (*Ibid.*)

To overcome the presumption of correctness, the appellant must raise in her opening brief a developed argument specifying how the evidence fails to support the factfinder's adverse findings. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*) [when "an appellant makes a general assertion, unsupported by specific argument, regarding insufficiency of evidence," the reviewing court may treat the point as forfeited]; *People v. Davis* (2022) 75 Cal.App.5th 694, 721 ["broad and conclusory argument" was "forfeited as unsupported by reasoned legal analysis and citation to authority"].) The failure to comply with these requirements allows the reviewing court to treat the point as forfeited. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [challenge forfeited where not raised in opening brief]; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1372, fn. 12 [challenge forfeited where not raised as independent issue in opening brief].)

24

## II.

*Maraglino Fails to Show Insufficient Evidence Supports the Determination She Was a Major Participant in the Kidnapping Who Acted with Reckless Indifference to Human Life*

In her briefing, Maraglino does not separately discuss each *Banks* and *Clark* factor. She instead "takes a holistic approach" because, she explains, the factors "contain 'a significant overlap' " and liability for felony murder under current law "turns on the totality of the circumstances." Maraglino's approach, however, ignores our Supreme Court's admonition that "[l]ower courts should take care to consider the presence or absence of evidence relating to each relevant factor on its own merits before considering the evidence in its totality." (*Emanuel, supra*, 17 Cal.5th at p. 888.) Heeding this admonition, we first relate Maraglino's arguments to specific *Banks* or *Clark* factors and consider them as challenges to the trial court's findings on the factors. We then determine whether the evidence, considered in its totality, is sufficient to support the court's ultimate finding that Maraglino is guilty of felony murder as a major participant who acted with reckless indifference to human life in the kidnapping that led to Killgore's death.

A.    *Major Participant*

1.    *First Factor—Role in Planning Kidnapping*

Maraglino challenges the trial court's finding that as the " 'ringleader' " she played a significant role in the kidnapping. She contends the court "pointed to no evidence to support such a claim," and nothing suggests she "advised Perez during the abduction" or "handed out orders to Perez and Lopez on what to do or say." Maraglino also contends that evidence she was "distressed" by Killgore's murder "runs contrary to the expected conduct of a criminal mastermind." These contentions are unpersuasive.

25

Maraglino cannot "show the evidence is insufficient by citing only [her] own evidence, or by arguing about what evidence is *not* in the record, or by portraying the evidence that is in the record in the light most favorable to [her]self." (*Sanghera, supra*, 139 Cal.App.4th at p. 1573.) That is all she has done by citing Perez's testimony that after the murder he found her "distressed about what had happened in her home." To prevail on her challenge, Maraglino must discuss "*all* of the material evidence on the disputed [issue] in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the [trial court's finding]." (*Id.* at p. 1574.) When the material evidence is viewed in that light, it supports the trial court's finding.

The trial court mentioned several facts about Maraglino's "role . . . in planning the criminal enterprise that led to [Killgore's death[ ]." (*Banks, supra*, 61 Cal.4th at p. 803.) The court mentioned the jury's verdict that Maraglino was guilty of conspiracy to commit kidnapping, which established her agreement with Perez to kidnap Killgore. (*People v. Ware* (2022) 14 Cal.5th 151, 163 [agreement to commit crime is essential element of conspiracy].) The jury's finding of that agreement is binding on Maraglino in this proceeding. (*People v. Curiel* (2023) 15 Cal.5th 433, 453 ["a relevant jury finding is generally preclusive in section 1172.6 proceedings"].) The court found Maraglino's BDSM fantasies of kidnapping, raping, torturing, and killing somebody and her animus toward Killgore for flirting with Perez (whose child Maraglino was carrying) provided a motive for the kidnapping. The court found Maraglino actively participated in the plan to kidnap Killgore by searching the Internet for dinner cruises in San Diego and by encouraging Killgore in the telephone call overheard by Tal to go on a cruise with Perez. Whether or not the trial court accurately characterized

Maraglino as the " 'ringleader' " of the kidnapping even though it identified no evidence she "advised" or "handed out orders" to Perez or Lopez during the kidnapping, the court reasonably could find she played a significant role in planning the kidnapping.

Maraglino resists this conclusion by citing Perez's trial testimony that after he discovered Lopez had murdered Killgore, left the house in a panic, and then returned, he found Maraglino "sitting on the couch . . . distressed." Even if Perez's testimony could support an inference that she played no role in the kidnapping, the trial court was not required to credit his testimony. Nor was it required to give his testimony and any related inference favorable to Maraglino more weight than the evidence that supported the inference she played a significant role in planning the kidnapping. At a section 1172.6 evidentiary hearing, "the superior court acts as an independent fact finder" (*People v. Saibu* (2022) 81 Cal.App.5th 709, 737) and has the "power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences" (*People v. Monterroso* (2004) 34 Cal.4th 743, 758 [cleaned up]). "We cannot reweigh the evidence or reassess witness credibility on our own." (*People v. Grandberry* (2025) 116 Cal.App.5th 934, 946 (*Grandberry*).) We must accept the reasonable inference the trial court drew from the circumstances. (*Clark, supra*, 63 Cal.4th at pp. 625–626; *In re McDowell* (2020) 55 Cal.App.5th 999, 1013–1014 (*McDowell*); *Sanghera, supra*, 139 Cal.App.4th at p. 1573.)

2. *Second Factor—Role in Supplying or Using Lethal Weapons*

Maraglino contends the second *Banks* factor "militates against a [major participant] finding" because "there was no evidence she personally provided any sort of weapon or tool to either [Lopez] or Perez." (Citing *In re Miller* (2017) 14 Cal.App.5th 960, 974 [fact that "gun used in the crime was supplied

27

by [codefendant], not defendant," was "mitigating"].) No evidence was presented at trial that Maraglino *directly* put into the hands of Perez or Lopez any of the weapons used in the crimes against Killgore. But there was evidence Maraglino had an *indirect* role in supplying weapons.

The trial court found significant that the crimes against Killgore were committed inside Maraglino's house, "where BDSM activities occurred" and "implements of that lifestyle" and other items that could be used as weapons were kept. The court mentioned a saw blade, rope, floggers, and power tools, which investigators found in the house or in Maraglino's truck. The court referred to Lopez's admission, made in the letter left in the hotel room where she attempted suicide, that she used rope to strangle Killgore and power tools to attempt to dismember her body while Maraglino was at home. The court referenced the medical examiner's testimony that injuries found on Killgore's body were consistent with restraint by handcuffs, strangulation by a rope or other ligature, and cutting by a saw. Substantial evidence supports the trial court's finding that by making her house and its contents available to Perez and Lopez, Maraglino played a role in supplying the weapons that were used to kidnap and murder Killgore.

3. *Third Factor—Awareness of Particular Dangers Posed by the Nature of the Crime, Weapons Used, or Past Experience or Conduct of the Other Participants*

Maraglino attacks the trial court's finding on the third *Banks* factor, which focuses on her knowledge of the dangerousness of the kidnapping and of her accomplices. She argues "no evidence permits the inference that [she] knew that Lopez or Perez harbored a homicidal animosity towards Kil[l]gore," that "prior abductions in which [she] participated involved the unwelcome infliction of physical harm to anyone," or that she "directed either Lopez or Perez to kill Kil[l]gore under any scenario." Maraglino also argues

28

her "distress" when she learned of the murder "leads to the inference that the planned kidnapping was not designed to endanger anyone's life (at least in [her] mind) and that someone (either Perez or Lopez or both) somehow deviated from the original conspiracy when the abduction resulted in death." Once again, Maraglino fails to satisfy her burden on appeal because she cites only evidence favorable to her and ignores evidence supporting the court's finding against her. (See *Sanghera, supra*, 139 Cal.App.4th at pp. 1573–1574.)

Abundant evidence supports the court's finding that Maraglino knew the planned kidnapping and her accomplices were dangerous. At the section 1172.6 evidentiary hearing, Maraglino admitted that during their BDSM sessions, Perez had cut her with knives and made her lose consciousness by stringing her up and whipping her for an hour, holding her under water, and choking her. She admitted she wrote a document purporting to release Perez from liability for any "loss of life that may result from [their BDSM] activities."[8] Evidence presented at trial showed

---

[8]  Maraglino asserts the release "is probative of nothing." She contends it "absolved Perez of guilt for a homicide stemming from his negligence or possibly his recklessness [during BDSM activities] rather than premeditation and deliberation," and there was "no evidence that BDSM activity was even afoot in the house at the time of Kil[l]gore's strangulation." We disagree. Evidence is probative if it tends to prove or disprove any disputed fact of consequence to determination of the proceeding. (*People v. Rivera* (2011) 201 Cal.App.4th 353, 362.) One of the facts at issue in determining Maraglino's liability for felony murder in the section 1172.6 proceeding was her "awareness . . . of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants." (*Banks, supra*, 61 Cal.4th at p. 803.) The trial evidence, which the court reviewed, tended to show Killgore died during a kidnapping that was part of a shared BDSM fantasy that Maraglino, Perez, and Lopez were acting out. Injuries to Killgore's neck and wrists were consistent with the restraint, strangulation, and cutting that Maraglino and Perez engaged in during their

Maraglino wrote BDSM fantasies involving abduction, rape, torture, and murder, which she discussed with Perez. Lopez's diary contained an entry describing the abduction, torture, and murder of a person she disliked. Maraglino had an audiovisual recording of Perez beating a restrained nude woman with various BDSM devices even after she begged him to stop, became motionless, and appeared to have lost consciousness. There was evidence that Perez and Maraglino had acted out a nonconsensual abduction fantasy on Nicole A. Maraglino admitted that on the day Killgore was kidnapped, she wrote a letter "entrust[ing]" Perez to "dispense the measure of retribution he deems appropriate to [her] enemies, tormentors, and violators."

This evidence and the evidence of Maraglino's animus toward Killgore, which the trial court mentioned, support the court's conclusion that there was "something more" to this case than "just the BDSM lifestyle," "the weapons," and "the dangers inherent within that." The evidence convinced the court that "[t]he *reason* [Killgore] was kidnapped was for exactly what happened in this particular case." (Italics added.) In other words, the court found Maraglino not only *knew* of the risk of death to Killgore but also *intended* Killgore's death as part of the BDSM fantasy she acted out with Perez and Lopez.

Maraglino argues the trial court could not make that finding, because Perez testified she was "distressed" upon learning of Killgore's murder and there was no evidence she "directed" him or Lopez to kill her. She cites *In re Scoggins* (2020) 9 Cal.5th 667, 683 (*Scoggins*), where our Supreme Court held the evidence was insufficient to prove a defendant who planned an unarmed

_____

BDSM sessions. That she purported to release him from any "loss of life" that could result from BDSM activities tended to prove she was aware the activities involved a risk of death.

30

assault and robbery with two accomplices that resulted in a shooting death was aware the crimes involved a serious risk of death.[9]  In that case, there was "affirmative evidence" the defendant did not plan for his accomplices to kill the victim (*Scoggins,* at p. 681); "insufficient" evidence he knew before the shooting that either accomplice was likely to use lethal force (*id.* at p. 682); and "no evidence" he instructed the accomplices to kill the victim under any scenario or to deviate from the plan once they got to the crime scene (*id.* at p. 679).  This case is not *Scoggins.*  Here, the direct evidence that Maraglino engaged with Perez in BDSM activities that she knew could be lethal and the circumstantial evidence that she, Perez, and Lopez were acting out a shared BDSM fantasy that included Killgore's kidnapping support the finding that Maraglino was aware of the serious risk of death to Killgore.  Maraglino essentially asks us to reevaluate witness credibility, reweigh the evidence, draw inferences different from those drawn by the trial court, and substitute a factual finding favorable to her for the adverse finding the trial court made.  As a reviewing court, we have no power to do any of that.  (*Clark, supra,* 63 Cal.4th at pp. 625–626; *Grandberry, supra*, 116 Cal.App.5th at p. 946.)

---

9     In *Scoggins*, the Supreme Court focused on the *Clark* factors rather than on the *Banks* factors because the defendant challenged the sufficiency of the evidence to support the jury's finding that he acted with reckless indifference to human life but not the jury's finding that he was a major participant in the assault and robbery.  (*Scoggins, supra*, 9 Cal.5th at p. 676.)  As previously noted, the *Banks* and *Clark* factors significantly overlap.  (See fn. 5, *ante*.)  Specifically, evidence relevant to the third *Banks* factor (awareness of dangers presented by the crime, weapons used, and past conduct of coparticipants) is also relevant to the fourth *Clark* factor (knowledge of coparticipants' likelihood of killing or propensity for violence).  (See *People v. Montanez* (2023) 91 Cal.App.5th 245, 283 (*Montanez*) [noting evidence supporting third *Banks* factor also supported fourth *Clark* factor].)

4.      *Fourth Factor—Presence at the Scene of the Killing, Ability to Prevent or Facilitate the Killing, and Actions or Inactions That Played a Role in the Death*

Maraglino challenges the sufficiency of the evidence to support the trial court's finding that she was present for Killgore's killing and facilitated the murder. She contends there was no evidence that she was "at the scene of the killing and could have prevented it." In support of this contention, Maraglino cites the letter Lopez left in the hotel room where she attempted suicide, in which Lopez wrote that she "moved [Maraglino] to bed around 11:15 p.m." and "taped up" Killgore "to make sure [she] hadn't woken [Maraglino]." Maraglino also cites Perez's trial testimony that immediately after discovering the murder he found her sleeping in her bedroom. "[B]y arguing about what evidence is *not* in the record [and] by portraying the evidence that is in the record in the light most favorable to [her]self," she has not met her burden to "*affirmatively demonstrate* that the evidence is insufficient." (*Sanghera, supra*, 139 Cal.App.4th at p. 1573.)

When viewed "in the light most favorable to the People," as it must be (*Sanghera, supra*, 139 Cal.App.4th at p. 1574), circumstantial evidence supports the court's finding that Maraglino was present for Killgore's murder. At 7:50 p.m. on April 13, 2012, Tal received from Killgore a text message that read, "Help." At about that time, a neighbor saw Perez's vehicle pull up to Maraglino's house. Cell phone tracking data placed Killgore's phone near Maraglino's house at 8:03 p.m. Video surveillance captured Maraglino and Lopez leaving a grocery store after Perez had taken Killgore to Maraglino's house and at 8:11 p.m. texted her to "[c]ome home." At 8:21 p.m., Hernandez telephoned Maraglino to ask where Killgore was, and Maraglino said she did not know. Cell phone tracking data placed Maraglino's phone near her house at that time. At 9:28 p.m., Maraglino

texted Perez that she was having a "quiet night at home." At 11:51 p.m., she texted him that she "ke[pt] falling asleep." Cell phone tracking data showed that from the night of April 13, 2012 (when Perez picked up Killgore), until the early morning hours of April 14, 2012 (when Killgore's body was dumped near Lake Skinner), Maraglino's phone did not leave Fallbrook. We must accept the reasonable inference from all this evidence that Maraglino was at home when Killgore was murdered there. (*Clark, supra*, 63 Cal.4th at pp. 625–626; *McDowell, supra*, 55 Cal.App.5th at pp. 1013–1014; *Sanghera,* at p. 1573.)

The evidence also supports the trial court's related finding that Maraglino facilitated the murder. As we explained when addressing the first *Banks* factor, by encouraging Killgore to go on a dinner cruise with Perez, Maraglino participated in the ruse by which Killgore was drawn into the BDSM fantasy that led to her death. The court accurately stated, "It would not have happened without her." The court also stated that the BDSM "dynamic[s] in the house at that time" were such that Maraglino "had somebody who would listen to her and do what she said in Ms. Lopez." Evidence supporting that statement included the letter in which Lopez confessed to the murder and described herself as Maraglino's "slave and pet" and the testimony of Dora B. (a former slave of Maraglino) that Lopez was a slave over whom Maraglino "had total control." A reasonable inference, which we must accept, is that Maraglino directed Lopez in the actions that led to Killgore's death. (*Clark, supra*, 63 Cal.4th at pp. 625–626; *McDowell, supra*, 55 Cal.App.5th at pp. 1013–1014; *Sanghera, supra*, 139 Cal.App.4th at p. 1573.)

Maraglino insists that "[t]he trial court's implied finding that [she] was present in the home and must have been aware of the commission of the

33

murder amounts to nothing more than speculation and suspicion." Neither speculation nor suspicion constitutes substantial evidence. (*People v. Waidla* (2000) 22 Cal.4th 690, 735; *People v. Martin* (1973) 9 Cal.3d 687, 695.) But " '[s]ubstantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57; accord, *Clark, supra*, 63 Cal.4th at p. 626.) The circumstantial evidence and related inferences we discussed above constituted substantial evidence sufficient to support the trial court's finding against Maraglino on the fourth *Banks* factor.

5.      *Fifth Factor—Conduct After Lethal Force Was Used*

As to the fifth *Banks* factor, Maraglino admits that she "assisted in the disposal of evidence after the killing," as the trial court found. She argues such conduct " 'shows fear' " and " 'is irrelevant to ascertaining [her] state of mind immediately prior to, or during, the killing.' " (Quoting *People v. Anderson* (1968) 70 Cal.2d 15, 32.) Maraglino's post-killing conduct may be irrelevant to deciding whether she deliberated and premeditated *as to the murder* (*ibid.*), but that is not the issue here. The issue is whether her participation *in the underlying kidnapping* "was sufficiently significant to be considered 'major.' " (*Banks, supra*, 61 Cal.4th at p. 803.) Maraglino's post-killing conduct is relevant to that issue because she conspired with Perez to kidnap Killgore. A "conspiracy may extend in point of time beyond the actual commission of the act constituting the crime for which the accused is being tried, such as for the purpose of concealing the crime." (*People v. Wells* (1960) 187 Cal.App.2d 324, 331 [cleaned up]; see *People v. Hardy* (1992) 2 Cal.4th 86, 204 [destruction of evidence may be part of conspiracy].) Her destruction of evidence after the murder furthered the conspiracy and provided additional, albeit slight, support for the court's finding she was a major participant in the planned kidnapping that led to Killgore's death. (See

*Montanez, supra*, 91 Cal.App.5th at p. 280 [disposing of evidence after murder "weigh[ed] only slightly in favor of a finding of major participation" in underlying felonies].)

B.      *Reckless Indifference to Human Life*

We next address the *Clark* factors, which the trial court found beyond a reasonable doubt showed that Maraglino acted with reckless indifference to human life.  Our discussion will be brief because Maraglino does not challenge the court's findings on some *Clark* factors and those she does challenge concern factors that overlap with *Banks* factors that we have already determined are supported by substantial evidence.

On the first *Clark* factor (knowledge, use, and number of weapons), Maraglino does not expressly address her *knowledge* of weapons.  She argues there was no evidence she *provided* any weapons to Perez or Lopez and that "mere access to a potential weapon" at her house does not support a finding against her.  We reject this argument.  As we explained when discussing the second *Banks* factor (role in supplying or using weapons), the evidence showed BDSM implements and other items that could be used as weapons were found in Maraglino's house, where Killgore was taken to be killed as part of the BDSM fantasy Maraglino was acting out with Perez and Lopez, and some of the items were used in the kidnapping and murder.  That evidence supports a finding that Maraglino knew about the weapons because, as the trial court stated, "everything was self-contained within her house where Ms. Killgore was brought, including all the weapons that were used pre- and postmortem."

Maraglino attacks the trial court's finding on the second *Clark* factor that she "was present while [the crime] occurred" and "had the opportunity to stop it if she wanted to," but "[t]here was no indication she did anything of

35

that nature." She cites evidence that she "was asleep in her bedroom when the homicide took place" and contends "no evidence permits an inference that she witnessed or heard the killing" or "displayed a reckless indifference to human life" by "fail[ing] to act as a restraining influence." This is essentially the same challenge Maraglino made to the trial court's finding on the fourth *Banks* factor (physical presence, opportunity to facilitate or prevent the killing, and actions or inactions that played a role in the death). It fails for the same reasons that challenge fails. (See *Montanez, supra*, 91 Cal.App.5th at pp. 281–283 [rejecting defendant's attack on finding on second *Clark* factor that "repeat[ed] many of the arguments" the court rejected when addressing fourth *Banks* factor].)

The third *Clark* factor (duration of the felony) "look[s] to whether a murder came at the end of a prolonged period of restraint of the victim by the defendant." (*Clark, supra*, 63 Cal.4th at p. 620.) Because there is a greater window of opportunity for violence that may culminate in murder when a victim is kidnapped or otherwise restrained for a prolonged period, the duration of the interaction between the victim and the defendant may indicate reckless indifference to human life. (*Ibid.*) The trial court found this factor supported Maraglino's culpability by noting that "during the long time" between when Perez picked up Killgore (about 7:37 p.m.) and her corpse was dumped near Lake Skinner (about 4:00 a.m. the next day), she "was restrained, tased, tortured, strangled, and killed." Evidence introduced at trial, including video surveillance of Killgore's apartment complex, cell phone tracking data, and injuries found on her body at autopsy, supports that finding. Maraglino does not discuss the court's finding on this factor in her briefing. We presume sufficient evidence supports it (*Sanghera, supra*,

36

139 Cal.App.4th at p. 1573) and deem any contrary contention forfeited (*Stanley, supra*, 10 Cal.4th at p. 793).

The fourth *Clark* factor (knowledge of cohorts' likelihood of killing and propensity for violence) significantly overlaps with the third *Banks* factor, which includes consideration of the defendant's "awareness . . . of particular dangers posed by . . . past experience or conduct of the other participants." (*Banks, supra*, 61 Cal.4th at p. 803.)  In making its finding on the fourth *Clark* factor, the trial court alluded to its finding on the third *Banks* factor by stating, "Again, the mistress/slave dynamic is highly relevant," and noting Maraglino had "significant knowledge of violent sexual conduct" within the BDSM community.  The arguments Maraglino asserted in challenging the sufficiency of the evidence to support the court's finding on the third *Banks* factor—there was no evidence she knew Perez or Lopez wanted to kill Killgore, directed them to kill her, or participated in abductions that involved physical harm—also apply to the court's finding on the fourth *Clark* factor. The arguments are no more persuasive as to this factor, and we again reject them.  (See *Montanez, supra*, 91 Cal.App.5th at p. 283 [rejecting defendant's arguments in opposition to finding on fourth *Clark* factor that were "duplicative of the arguments he raised in opposition to an unfavorable finding on the third *Banks* factor"].)

"The final *Clark* factor, the defendant's efforts to minimize the risks of violence during the felony, is a factor that mitigates culpability." (*Montanez, supra*, 91 Cal.App.5th at p. 284.)  The trial court found Maraglino did nothing "to minimize the risks of what was going on."  Her opening brief contains no discussion of this factor.  In her reply brief, Maraglino cites no evidence to contradict the court's finding.  She merely argues her failure to minimize the risk of violence during the kidnapping " 'does not necessarily evince a

37

subjective disregard for risk where the objective circumstances of the planned crime suggest the risk of violence posed is no more than that inherent in any violent felony.' " (Quoting *Emanuel, supra*, 17 Cal.5th at p. 888.) According to Maraglino, since "the abduction of Kil[l]gore did not include a risk of violence that exceeded that seen in other kidnappings," her failure to minimize that foreseeable risk does not support a finding she acted with reckless indifference to human life.

Maraglino forfeited this argument by waiting until her reply brief to assert it. (*People v. Choyce* (2025) 18 Cal.5th 86, 114.) " '[I]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party.' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218–1219.) Even were we to accept Maraglino's dubious assertion that Killgore's kidnapping involved no risk of violence greater than that of other kidnappings, all that would follow under *Emanuel* is that her failure to take steps to reduce the risk "cannot be said *to weigh in favor of* a finding of reckless indifference." (*Emanuel, supra*, 17 Cal.5th at p. 888, italics added.) But as we noted, "efforts to minimize the risks of violence during the felony[ ] is a factor that *mitigates* culpability." (*Montanez, supra*, 91 Cal.App.5th at p. 284, italics added.) The absence of such efforts by Maraglino may not increase her culpability, but it does not decrease it either.

C.    *Conclusion*

The trial court conducted the required " 'fact-intensive, individualized inquiry' into where [Maraglino's] conduct falls on the spectrum of culpability" (*Emanuel, supra*, 17 Cal.5th at p. 883) and found her guilty of murder as a "major participant" who "acted with reckless indifference to human life" in the kidnapping of Killgore (§ 189, subd. (e)(3)). In reviewing that finding for substantial evidence, we conclude that all but one of the *Banks* and *Clark*

38

factors support the finding, and the one that does not (the fifth *Clark* factor) is a mitigating factor that does not lessen Maraglino's culpability.  We further conclude, based on our review of the record, that "the totality of the circumstances" (*Scoggins, supra*, 9 Cal.5th at p. 677; *Banks, supra*, 61 Cal.4th at p. 802) shows Maraglino was "actively and substantially involved in the events leading up to [Killgore's] murder" (*Banks,* at p. 801) and " 'knowingly engag[ed] in criminal activities known to carry a grave risk of death' " (*Clark, supra*, 63 Cal.4th at p. 616).  Accordingly, the legislative changes to the felony-murder rule that took effect after she was convicted do not relieve her of liability for the murder, and the trial court did not err in refusing to vacate the conviction.  (§ 1172.6, subd. (a)(3); *People v. Hill* (2024) 100 Cal.App.5th 1055, 1076.)

### III.

### *The Trial Court's Denial of Relief Did Not Violate Maraglino's Federal Constitutional Right to Due Process of Law*

Maraglino contends the trial court "denied [her] due process, because it reaffirmed a conviction which, under current law, should not stand."  (See U.S. Const., 14th Amend., § 1 ["nor shall any State deprive any person of life, liberty, or property, without due process of law"].)  Her theory is that by denying the section 1172.6 petition based on factual findings unsupported by sufficient evidence, the court acted so arbitrarily or capriciously as to violate the Fourteenth Amendment.  (See *Richmond v. Lewis* (1992) 506 U.S. 40, 50 [state court's " 'arbitrary or capricious' " application of state law may " 'constitute an independent due process . . . violation' "].)  We are not persuaded.

A prisoner's "potential for relief under section 1172.6 from a prior murder . . . conviction is a 'significant' [liberty] interest." (*People v.*

39

*Delgadillo* (2022) 14 Cal.5th 216, 229.) When "a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication" (*Swarthout v. Cooke* (2011) 562 U.S. 216, 220) and "preserves [the interest] against arbitrary deprivation by the State" (*Hicks v. Oklahoma* (1980) 447 U.S. 343, 346). No such deprivation occurred in this case. The trial court followed the statutory procedure by appointing counsel for Maraglino, obtaining briefs from the parties, and holding an evidentiary hearing at which it applied the prescribed standard of proof to find her ineligible for relief. (§ 1172.6, subds. (b)(3), (c), (d)(1), (3); see *People v. Silva* (2021) 72 Cal.App.5th 505, 523 ["Notice and an opportunity to be heard are the fundamental hallmarks of due process whenever 'life, liberty, or property' is put in jeopardy."].) As we have explained, the evidence introduced at the hearing was legally sufficient to support the court's determination. "Because we conclude that the trial court did not err in denying [Maraglino's] petition for resentencing, [she] has failed to demonstrate any violation of due process." (*People v. Garrison* (2021) 73 Cal.App.5th 735, 748.)

DISPOSITION

The order is affirmed.

DO, J.

WE CONCUR:

MCCONNELL, P. J.

KELETY, J.

40